**UNITED STATES of America**

v.

**CROWN ZELLERBACH CORPORATION, American Linen Supply Company, Frank G. Steiner, Jonas H. Mayer, and Wayne Brown.**

**No. 55 C 1430.**

United States District Court
N. D. Illinois.
April 11, 1956.

Earl A. Jinkinson, Bertram M. Long, Raymond C. Nordhaus, Chicago, Ill., for plaintiff.

William J. Friedman, Joseph T. Zoline, Jack H. Oppenheim, Chicago, Ill., Philip S. Ehrlich, Philip S. Ehrlich, Jr., San Francisco, Cal., for defendants Crown Zellerbach Corp. and Wayne Brown, Friedman, Zoline & Rosenfield, Chicago, Ill., of counsel.

Leo F. Tierney, Roger W. Barrett, Charles L. Stewart, Jr., Chicago, Ill., for defendants American Linen Supply Co., Frank G. Steiner and Jonas H. Mayer, Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., of counsel.

HOFFMAN, District Judge.

This proceeding in equity was brought by the United States under the provisions of Section 4 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 4, 26 Stat. 209 as amended, to enjoin alleged offenses under Section 1 of the Sherman Act, 15 U.S.C.A. § 1, 26 Stat. 209 as amended. The suit was originally commenced in the District Court for the Eastern District of Wisconsin, and was transferred to this court upon the defendants' motion under the provisions of § 1404 of the Judicial Code, 28 U.S.C.

Named as defendants are two corporations and three individuals. The defendant American Linen Supply Company (hereafter referred to as ALSCO) is a Nevada corporation with principal offices in Chicago. ALSCO's president, Frank G. Steiner, and its vice-president, Jonas H. Mayer, are also joined. The other corporate defendant is Crown Zellerbach Corporation (hereafter referred to as Crown), also incorporated under the laws of Nevada, and maintaining its principal offices in San Francisco. The defendant Wayne Brown is presently assistant vice-president of Crown and was formerly sales manager for Crown's Eastern Division. All are charged in the complaint with a conspiracy to restrain trade and commerce in the sale of paper towel cabinets and paper towels in violation of Section 1 of the Sherman Act.

The matter is now before the court upon a group of motions by the defendants directed against the complaint. ALSCO and Crown have moved for dismissal upon the ground that the complaint is legally insufficient. The three individual defendants seek dismissal of the action as to them upon the ground that the complaint fails to state a claim upon which relief can be granted against them. And all of the defendants have presented combined motions for an order striking certain allegations of the complaint or, in the alternative, for an order directing the plaintiff to provide a more definite statement of these allegations.

Allegations of the Complaint.

The controversy arises, according to the plaintiff's complaint, out of an arrangement between ALSCO and Crown which had its beginnings in 1938. ALSCO was then engaged in the business of manufacturing and distributing cabinets for dispensing linen and paper towels, and of selling paper towels. It was the owner of certain patents covering the mechanisms of paper towel cabinets which control the rate of dispensing rolled towels. These cabinets, and the towels dispensed by them, were distributed to various industrial concerns, stores, restaurants, Government agencies, and institutions, through independent distributors classified either as linen supply companies or as paper jobbers. Broadly speaking, the complaint defines linen supply companies as distributors of paper towel cabinets and paper toweling who also supply cloth towels, tablecloths, napkins, uniforms, and other cloth products to their customers. Paper jobbers, on the other hand, supply only paper goods and cabinets for dispensing them.

The method of distribution employed by ALSCO involved a sale of the paper towel cabinet, with an accompanying lease of the patented mechanism, to the distributing linen supply company or paper jobber. These distributors, in turn, installed the paper towel cabinets in the places of business of their customers without charge upon the condition that the customers would purchase their total requirements of paper towels from the distributor making the installation. ALSCO also operates its own linen supply companies, dealing directly with the customers.

In 1938, ALSCO entered into a written agreement with Crown, a corporation similarly engaged in distributing paper towel cabinets and of producing and selling paper towels. Under the terms of this agreement, it is alleged, ALSCO licensed Crown to use and to distribute ALSCO's patented paper towel cabinets in the continental limits of the United States east of the Mississippi

River. ALSCO reserved to itself the territory west of the Mississippi, and, in addition, agreed that Crown's license to distribute the patented cabinets in the eastern territory should be exclusive except for the right to distribute to customers in the linen or cloth towel supply business, which ALSCO reserved exclusively to itself. The effect of this alleged agreement was to give Crown the sole right to sell the cabinets to paper jobbers in the eastern United States, and to reserve to ALSCO the linen supply company customers in that area. All customers west of the Mississippi were reserved to ALSCO.

Crown also agreed, the complaint continues, that it would not sell but would only lease the patented cabinets to the distributors, and that each such lease would require the cabinet to be used only to dispense paper towels purchased from Crown. Crown agreed in addition not to manufacture, purchase, or lease any other paper towel cabinet in its territory, and not to contest ALSCO's present or future patents on paper towel dispensing appliances. Competition between the respective distributors of Crown and ALSCO was foreclosed by Crown's agreement that it would not sell or lease any cabinets to replace cloth or paper towel cabinets installed by any of ALSCO's distributors, and by ALSCO's agreement that any of its linen supply company distributors who replaced cabinets installed by one of Crown's jobbers would lose the right to be protected from competition from Crown's paper jobbers.

This agreement was modified, according to the complaint, on May 29, 1942 and again on January 1, 1949. These modifications consisted in the deletion of (1) any reference to the restriction on Crown's manufacturing, purchasing, or leasing any other paper towel cabinets in its territory, (2) any reference to the agreement that leases made by Crown should require the cabinet to be used to dispense towels purchased from Crown only, and (3) any reference to the restriction upon the jobbers of

ALSCO and Crown from competing with each other by raiding each other's customers and replacing cabinets installed by the other.

Subsequently, on February 1, 1952, ALSCO's president, the defendant Frank G. Steiner, terminated the exclusive territorial rights of Crown in the territory east of the Mississippi, leaving ALSCO or some other licensee it might designate free, on the face of the written agreement, to sell and lease paper towel cabinets containing ALSCO's patented parts in that area.

Notwithstanding these modifications of the 1938 agreement, the government charges, the defendants have continued to carry out and to effectuate many of the terms of the original 1938 contract and the practices it provided. Thus although the exclusive nature of Crown's license was withdrawn, ALSCO agreed to confer with Crown before appointing as its distributor any paper jobber in the territory east of the Mississippi. ALSCO continues to prevent Crown from selling or leasing the paper towel cabinets covered by the license in the territory, reserved to ALSCO, west of the Mississippi. Crown is still prohibited from dealing with linen supply companies, in any part of the United States. And the defendants have agreed to prevent their jobbers and distributors from competing for each other's customers.

Under the defendants' arrangements, ALSCO has marketed the paper towel cabinets containing the patented mechanism under the trade name "American Automatic," while Crown has distributed the same cabinets under its license as "Tymatic" towel dispensers. The government claims in its complaint that in order to prevent their respective distributors from competing for each other's customers and to prevent other manufacturers of paper toweling from competing with the defendants, Crown and ALSCO have devised a scheme known as "bootleg control." This consists of fitting each cabinet with attachments and special groovings so that only specially designed rolls of paper towels can be

used. At the time of filing the complaint, it is said, ALSCO's "American Automatic" cabinets can thus accomodate only paper towels sold by ALSCO, and Crown's "Tymatic" cabinets require Crown's paper towel rolls.

Until some time in 1952, the complaint continues, ALSCO purchased its total requirements of paper towels from Crown. Since that time it has produced and manufactured a part of its needs, has purchased part from Crown, and has obtained the remainder of its needs from other paper producers.

In enforcing the agreements and understandings between them, the defendants, according to the government's claim, have investigated compliance with their terms and have compelled observance, have required their jobbers who have violated the agreements to make restitution for customers they have taken, and have threatened to cancel and have cancelled their jobber's agreements with jobbers who fail to conform.

On the question of the quantitative substantiality of the commerce affected, the complaint sets forth that in 1949 ALSCO had approximately 125,000 of its paper towel cabinets installed and in use, and in that year sold an estimated 140,000 cases of paper towels. At the time of the filing of the complaint, ALSCO had roughly 275,000 of its cabinets in use, and was selling paper towels at an annual rate of 340,000 cases at a price of approximately $7 per case. Crown, it is averred, had 57,519 of its cabinets containing the ALSCO mechanism installed and in use in 1949, and sold about 97,782 cases of paper towels during that year. When the complaint was filed, Crown had installed and in use an estimated 184,821 paper towel cabinets, and sold paper towels in the amount of 314,196 cases per year at the approximate price of $8 per case. Crown allegedly buys its towel cabinets at cost from ALSCO for approximately $8 per cabinet, including royalty.

The government charges that this continuing arrangement between the defendants was entered into "in order to eliminate competition between the defendants and protect linen supply companies from the competition of defendant Crown's paper jobbers * * * " It constitutes, it is claimed, a combination and conspiracy to restrain trade and commerce in paper towel cabinets and paper towels outlawed by Section 1 of the Sherman Act, and its effect has been to restrain the distribution of paper towel cabinets and paper towels, to eliminate competition among the defendants, to prevent linen supply companies and paper jobbers from selecting their own customers, and to prevent other manufacturers of paper towels from selling to the defendants' distributors. The complaint concludes with appropriate prayers for relief, requesting declarations and adjudications of a conspiracy and combination in restraint of trade, of the invalidity of the various agreements and understandings alleged, and of ALSCO's unlawful use of its patents, and seeking injunctive relief against continued violation.

### Motion to Dismiss the Complaint.

The defendants Crown and ALSCO have moved for an order dismissing the complaint upon the ground that it fails to state an offense under the antitrust laws, and is legally insufficient in that it does not state a claim upon which relief can be granted. The office of this motion, under the provisions of Rule 12(b) (6), Federal Rules of Civil Procedure, 28 U.S.C., is limited. Pleadings are not held to the rigid standards of the common law, and neither absolute clarity nor absolute precision is required. It is enough to sustain a pleading against a motion to dismiss that the defendant is informed with reasonable particularity of a legally cognizable claim against him. No special form of allegation need be respected so long as the claim is stated briefly and plainly. If the plaintiff could recover on any state of facts which it might prove under the allegations as laid, the motion must be denied. See Mullen v. Fitz Simons & Connell

Dredge & Dock Co., 7 Cir., 1949, 172 F. 2d 601, certiorari denied 1949, 337 U.S. 959, 69 S.Ct. 1534, 93 L.Ed. 1758. It is now regarded as more important to reach the merits of the claim upon the trial with reasonable dispatch than to delay disposition in an attempt to shape the pleadings to present fully crystallized and refined issues. In an antitrust case, a complaint that discloses, in one form of allegation or another, every element essential to recovery is not to be summarily dismissed. United States v. Employing Plasterers' Ass'n of Chicago, 1954, 347 U.S. 186, 74 S.Ct. 452, 98 L. Ed. 618.

█ With these postulates in mind, we turn to a consideration of the matters alleged in the complaint. The case arises in that shadowy area where the complementary policies of the patent and antitrust laws meet, and where choice between the routes offered by the two laws is often difficult. See Oppenheim, Patents and Antitrust: Peaceful Coexistence?, 54 Mich.L.Rev. 199 (1955). The patent serves the public interest by stimulating invention and, in the longer run, by enhancing competition; the antitrust laws, at the same time, seek to keep open the avenues of invention as well as of trade. Antitrust considerations are not to override the limited monopoly conferred by a patent, nor may a patent be employed beyond its scope for purposes condemned by the Sherman Act.

█ Broadly restated, the complaint charges the defendants with having conspired and combined for the purpose of eliminating competition between themselves and between their customers. The arrangements described in the complaint go far toward assigning to Crown and to ALSCO each an unmolested share of the national market in paper towel cabinets and paper towels. If this purpose is established, the fact that a patent is used to cover the restraint will not justify the arrangements. The limited monopoly granted to an inventor cannot be made to serve as the instrumentality of unlawful combination, or

"as a peg upon which to attach contracts with former or prospective competitors, touching business relations other than the making and vending of patented devices." United States v. Line Material Co., 1948, 333 U.S. 287, 304, 68 S.Ct. 550, 559, 92 L.Ed. 701. The value of the patent monopoly lies largely in its transferability, through licensing arrangements. But patent licenses cannot be used simply as a means for dividing a market among competitors, and of eliminating competition beyond the scope of the patent claims. United States v. United States Gypsum Co., 1948, 333 U.S. 364, 68 S.Ct. 525, 92 L. Ed. 746; Hartford-Empire Co. v. United States, 1945, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322. The complaint sets up a situation where patent licenses have been utilized to support a system of pervasive control in the paper towel cabinet and paper towel industry. Regardless of the possible legality of each of the agreements and practices standing alone, their total effect, qualified by the alleged unlawful purpose to restrain trade, will suffice to support the complaint against a motion to dismiss.

Ordinarily it is enough to the denial of a motion to dismiss that there is some legally sufficient claim for relief, and other claims need not be considered. In the interests of clarifying the issues of this litigation and of facilitating its disposition on the merits, however, the legality of the particular elements of alleged conspiracy will be briefly surveyed.

█ According to the complaint, Crown agreed with ALSCO in the original contract of 1938 not to manufacture, purchase, or lease any paper towel cabinets other than those containing ALSCO's patented mechanisms. The patent confers the right to exclude others from use of the patented invention. But it does not legalize the exclusion of competition from unpatented products, and any attempt to prohibit competition from unpatented goods carries the patentee beyond the immunity of the patent law and into the area where general

law, and more particularly the antitrust law, controls. Thus it is held that a patentee who exacts a promise from his licensee not to engage in the manufacture or sale of competing goods not covered by the patent forfeits his patent protections. McCullough v. Kammerer Corp., 9 Cir., 1948, 166 F.2d 759; National Lockwasher Co. v. George K. Garrett Co., 3 Cir., 1943, 137 F.2d 255. As an attempt to restrain trade, therefore, this provision of the defendants' agreement must fall under the condemnation of the Sherman Act. The fact that this agreement was deleted in the course of the modifications in 1942 and 1949 does not deprive it of all significance. The combinations which the Sherman Act prohibits are not limited to enforcible contracts in writing. If the limitation has been wholly abandoned as an agreement or as an understanding, it still may serve to give color to the underlying general intention of the defendants in undertaking their mutual arrangement.

 The complaint also alleges that Crown received a license, exclusive for a designated class of customers, to manufacture, purchase, and lease cabinets containing ALSCO's patented parts in that portion of the United States lying east of the Mississippi River. The western territory was reserved by ALSCO. Viewed simply as a territorial limitation upon Crown's license, this agreement is a valid exercise of ALSCO's patent rights. The assignment statute, as carried over into the new Patent Code, 35 U.S.C. § 261, provides that:

"* * * The applicant, patentee, or his assigns or legal representatives may * * * grant and convey an exclusive right * * * to the whole or any specified part of the United States."

Thus a license covering the exercise of rights under a patent limited to the United States and its territories and possessions does not offend the antitrust laws without a showing of additional facts and reasons. Brownell v. Ketcham Wire & Mfg. Co., 9 Cir., 1954, 211 F.2d 121. Territorial licenses, without more, are a reasonable means for the patentee to secure the reward granted to him. Like other restrictions upon the patentee, geographical limits may be imposed to protect the patentee's profits derived from his own exercise of the patent rights. See United States v. General Electric Co., 1926, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362; General Talking Pictures Corp. v. Western Electric Co., 1938, 305 U.S. 124, 59 S.Ct. 116, 83 L.Ed. 81. While the patentee remains free to protect himself, within the scope of the patent, by restricting the licensee, restrictions imposed upon the patentee by the licensing agreement must be viewed in a different light. Restraints upon competition for the benefit of the licensee are to be measured not by the standards of the patent laws, but by the general rules governing the validity of competitive restrictions attached to the conveyance of personal property. Here, although the patentee's agreement not to compete with the licensee was ostensibly vitiated when the defendant Steiner terminated Crown's exclusive rights in the eastern United States, it is alleged that the patentee ALSCO had agreed to confer with Crown before appointing as a distributor any paper jobber in the territory east of the Mississippi. The understanding fairly implied is that Crown's wishes will be given consideration. By serving the interests of Crown and not of ALSCO, the agreement presents a genuine and triable issue under the Sherman Act. In analogous circumstances, it has been held that an agreement by the patentee giving the licensee a veto power in the selection of additional licensees is invalid. United States v. Besser Mfg. Co., D.C.E.D.Mich.1951, 96 F.Supp. 304, affirmed, 1952, 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063. To the same effect is McCullough v. Kammerer Corp., 9 Cir., 1948, 166 F.2d 759, where the patentee had agreed, for the benefit of his licensee, not to engage in the manufacture or sale of unpatented products in competition with the licensed article.

Whether upon the facts of this litigation these decisions will control, or whether other considerations may justify ALSCO's agreement to confer before appointing a paper jobber as its distributor in the eastern territory, can be determined only after answer and trial.

■ Similar considerations will determine the legality of the market division accomplished by limiting Crown's license in the eastern United States to dealings with paper jobbers and reserving the custom of linen supply companies to ALSCO, and by excluding AL-SCO from selling or leasing to paper jobbers under the original agreement, or, as modified, subjecting such dealings to a duty to confer with Crown. Such an allocation of customers, not immunized by the patent laws, would constitute a violation, *per se*, of the Sherman Act. Addyston Pipe & Steel Co. v. United States, 1899, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136; Las Vegas Merchant Plumbers Ass'n v. United States, 9 Cir., 1954, 210 F.2d 732. In support of their argument that the patent justifies this allocation, the defendants rely primarily upon General Talking Pictures Corp. v. Western Electric Co., 1938, 305 U.S. 124, 59 S.Ct. 116, 83 L.Ed. 81, and its progeny in the lower courts. But the decision is not necessarily controlling. In General Talking Pictures, the licensee was restricted to manufacturing products embodying the patent only for a specified field of use, and he was, correspondingly, excluded from manufacturing patented products for use in other fields. The licensee's sale in a prohibited field, and in competition in an area reserved by the patentee, was held to infringe the patent, since in exceeding the bounds of his license, the defendant put himself in the position of a stranger to the patent. The cases go no further than to establish that in granting a license, the patentee may impose restrictions reasonably calculated to preserve to him the benefits of the patent. The Court neither discussed nor decided the effect of restrictions imposed not to protect the patentee but for the benefit of the licensee. Moreover, the General Talking Pictures case involved separate identifiable fields of use of the patented device: the home radio market on the one hand, and the commercial sound recording and reproducing market on the other. From the complaint it appears that the paper towel cabinets containing ALSCO's patented parts are used in precisely the same way by the paper jobbers allocated to Crown and by the linen supply companies reserved to ALSCO. Simple division of a list of potential customers in a single market presents considerations not dealt with in the cited cases, considerations that can be weighed only upon a full record disclosing the extent of competition between paper jobbers and linen supply companies and the intention behind the allocation.

■ The validity of the allocation is also affected by the allegations tending to show that the arrangement extends beyond the limited scope of the patent awarded to ALSCO. The patent creates a limited monopoly, and within its scope constitutes an exception to the antitrust laws. But the patentee can claim nothing beyond the rights granted, and he may not use the grant as an instrument to extend monopolistic power to other products or devices. Here it appears that the patented invention relates only to certain mechanisms designed to control the rate of dispensing paper towels. Whether the claims and specifications of the patent are broad enough to support the restriction on the use of the whole cabinet, or whether the patented component of the unpatented combination is insufficient to justify the restraint, are questions not appropriate for decision upon an unanswered complaint. See, for example, United States v. United States Gypsum Co., 1948, 333 U.S. 364, 384–385, 68 S.Ct. 525, 92 L.Ed. 746.

■ It is also alleged that through the use of the attachments and groovings known as bootleg control, the defendants have compelled the use of AL-SCO towels in ALSCO cabinets and of Crown towels in Crown cabinets, and

that, until the modifications of 1942 and 1949, Crown was obliged by its agreement with ALSCO to lease its cabinets only upon the condition that Crown towels would be used in them. In conjunction with the allocation of customers between ALSCO and Crown, this tying arrangement amounts to an allocation of the paper towel market in the territory east of the Mississippi. Since paper towels appear to be beyond the scope of ALSCO's patent, this division of the trade must be governed by the general law. It was observed in Mercoid Corp. v. Mid-Continent Inv. Co., 1944, 320 U.S. 661, 64 S.Ct. 268, 88 L. Ed. 376, that:

" * * * When the patentee ties something else to his invention, he acts only by virtue of his right as the owner of property to make contracts concerning it and not otherwise saved by anything in the patent laws because it relates to the invention. If it were, the mere act of the patentee could make the distinctive claim of the patent attach to something which does not possess the quality of invention. Then the patent would be diverted from its statutory purpose and become a ready instrument for economic control in domains where the anti-trust acts or other laws not the patent wise. He then is subject to all the limitations upon that right which the general law imposes upon such contracts. The contract is not statutes define the public policy." 320 U.S. at page 666, 64 S.Ct. at page 271.

 Apart from the effect of these arrangements in eliminating competition between Crown and ALSCO, the tying agreements devices also tend to exclude competition from other manufacturers of paper towels for the distributors' business, and, because the towel cabinets are installed without charge by the distributors upon the condition that the customer will buy his total toweling requirements from the distributor making the installation, for the business of the

ultimate customers as well. These allegations suffice to raise a triable claim of illegality under the cases holding tying arrangements invalid under Section 1 of the Sherman Act. International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; International Business Machines Corp. v. United States, 1936, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085.

 If the agreements eliminating competition between ALSCO and Crown, by assigning linen supply company customers to ALSCO and paper jobbers to Crown, should prove to be a violation of the Sherman Act, it would seem to follow that the provisions of the agreements preventing competition between their respective licensees must also fall within the ban. To prohibit paper jobbers served by Crown from replacing towel cabinets installed by ALSCO's linen supply company distributors, and to deny the protection of this restriction to any linen supply company that replaces a cabinet installed by a Crown paper jobber, can be supported only if ALSCO and Crown themselves can legally agree not to compete. From what has been said regarding the defendants' allocation of customers, it follows that the allegations regarding the distributors' restrictions can withstand a motion to dismiss.

 Furthermore, the restrictions upon competition between linen supply companies and paper jobbers may run afoul of the antitrust laws for additional reasons not involved in the restraints betwen ALSCO and Crown. Restrictions as between licensees, not involving the patentee, will seldom serve to protect the interests of the patentee within the limits of the patent. More usually, such restraints will benefit only the licensees, and will therefore transcend the boundaries of the patent monopoly. In such a case, the agreements must be judged as if no patented product were involved. Thus in Ethyl Gasoline Corp. v. United States, 1940, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852, the owner of a patented fluid and of a patent

covering the process of making motor fuel with the fluid licensed refiners under the process patent to make the motor fuel. Under the license, the refiners were required to sell only to licensed jobbers, and the jobbers in turn were prevented in specified ways from competing with each other. The Court held the elimination of jobber competition to be in violation of the Sherman Act. The restrictions upon the jobbers, it was said, were invalid because they benefited only other licensees, and had no relation to the protection of the patent rights of the owner. The only aspect in which the patentee's interests were served was the increased sale of the patented fluid, but since that patent was separate and distinct from the process patent under which the licenses were made, this benefit was beyond the scope of the process patent involved. The restrictions therefore constituted an attempt to extend the monopoly of the patent beyond the grant. Here the licensee's jobbers are similarly limited in their competition. It may appear at trial that these limitations are sufficiently related to protecting the rights of ALSCO under its patents to justify their imposition, and that they were not imposed in furtherance of an illegal plan to eliminate competition. But it cannot be said upon the basis of the complaint alone that such a justification exists.

The question remains of the effect of these restraints upon interstate trade and commerce. The complaint adequately sets up the interstate character of the defendants' dealings in paper towel cabinets and paper towels. According to the complaint, the defendants' total sales of paper towels gross approximately $5,000,000 per year. The total sales price of the patented cabinets in use at the time the complaint was filed exceeds $2,000,000. The complaint alleges that the defendants' activities have restrained trade and commerce within the meaning of the Sherman Act. This is enough to entitle the plaintiff to a trial of its claim. See United States v. Employing Plasterers Association of Chicago, 1954, 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618. Whether the patents covering the timing mechanisms confer a dominant market position, whether they set the ALSCO cabinets apart so as to make them the subject of a separable economic market, whether the market should be defined so as to include other types of paper or cloth towel dispensers, and if so, whether a substantial volume of the relevant commerce is affected— all these are questions appropriate for decision upon evidence and not upon a pleading.

The defendants' motion to dismiss for failure to state a claim upon which relief can be granted is, accordingly, denied.

### Motion to Strike or for More Definite Statement.

The defendants have also filed a motion to strike certain allegations from the complaint or, in the alternative, for a more definite statement of those allegations.

The motion to strike has a limited function in the system of practice laid down by the Federal Rules of Civil Procedure. Federal Rule 12(f) provides simply that upon motion duly made, "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Under the letter of these provisions, the motion to strike is not properly used to test the legal sufficiency of the complaint or any part of it. Some courts have nevertheless held that it will lie to challenge the sufficiency of one of several claims included in a single count. See, for example, Smith v. Pennsylvania Central Airlines Corp., D.C.D.D.C.1948, 76 F.Supp. 940, 6 A.L.R.2d 521; Garcia v. Hilton Hotels International, D.C.D.Puerto Rico 1951, 97 F.Supp. 5. It is unnecessary to decide whether we would follow that view of the office of a motion to strike, because in so far as the defendants' motion is predicated upon the legal insufficiency of the allegations attacked, the points have been

considered in the disposition of the motion to dismiss, above.

 The remaining objections available under the motion are redundancy, immateriality, and impertinence. Motions to strike upon these grounds are not favored, and it is generally said that the motion will be denied if the allegations may have some bearing upon the subject matter of the litigation and are not clearly irrelevant. Kraus v. General Motors Corp., D.C.N.Y.1939, 27 F.Supp. 537; United States v. Bize, D.C.D.Neb. 1949, 86 F.Supp. 939. While the complaint contains somewhat more in the way of evidentiary detail than might be thought proper, the defendants' alternative motion for a more definite statement suggests that this is not the basis of their motion. If it were, the disposition of it would be the same. In so far as the complaint sets forth evidentiary matters, they are relevant to the controversy and provide a background for an understanding of the charges. As such, they should not be stricken. United States v. Johns-Manville Corp., D.C. N.D.Ill.1941, 1 F.R.D. 548; Sinaiko Bros. Coal & Oil Co. v. Ethyl Gasoline Corp., D.C.S.D.N.Y.1942, 2 F.R.D. 305.

The case will be tried to the court without a jury, and the defendants have failed to show how they will be prejudiced by the presence of any irrelevant or immaterial allegation, or by any supposed lack of art in the pleading. The interests of literacy do not warrant delay in these proceedings while the complaint is redrawn to eliminate unnecessary but nonprejudicial allegations. For the vices of vagueness and ambiguity, another remedy, considered below, is offered. It would serve no useful purpose in this memorandum to recount in detail the several allegations attacked by the motion. It suffices to say that on the basis of these considerations the various branches of the motion to strike have been considered, and that the motion is denied.

 The alternative motion for an order requiring a more definite statement of certain of the complaint's charges is governed by similar policies. The motion under existing federal practice has a narrower scope than the usual motion to make more definite and certain under the typical state code pleading system. Under Federal Rule 12(e), the motion for a more definite statement is to be granted only if the complaint "is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Before the 1946 revision of the Rules, an alternative motion for a bill of particulars was provided, as a means of obtaining information necessary to preparation for trial. The provision was deleted because experience had demonstrated that the liberal discovery and deposition procedures provided a more effective and less time-consuming method for preparing for trial. The motion for a more definite statement was thereby confined solely to the task of making the complaint sufficiently clear that the defendant can plead to it in the simple and nontechnical style contemplated by the Rules.

 While the complaint filed on the government's behalf may not be a model of verbal precision and clarity, its import is plain enough. There is no doubt concerning the charge made against the defendants, and the matters upon which the defendants seek enlightenment are largely details of how the offenses were committed. Broadly summarized, the defendants' fifteen objections fall into two general classes. One group of objections is aimed at requiring detailed information on how the alleged combination, agreements, and understanding were made, and on what their precise terms may be. It should be recalled, however, that a suit charging an unlawful agreement under the antitrust laws is not a suit for breach of contract. By the nature of the agreement it will often be entered into without usual legal formalities and with a degree of uncertainty. If it is reduced to writing, the written agreement does not fix the limits of legal inquiry. Oral or implied understandings, whether legally enforcible or not,

may contradict or qualify the written word for purposes of the Sherman Act. Whether an agreement in restraint of trade was oral or written, and whether if written it was made by interlineation on a previous agreement or by a new writing are immaterial at the pleading stage in an antitrust proceeding, and the defendants do not need such information in order to plead. If it should prove desirable to inquire into the government's position on these matters in preparation for trial, the remedies of interrogatories under Rule 33, motions to produce written documents under Rule 34, and requests to admit the genuineness of documents or the existence of facts under Rule 36 will be available.

 The defendants, in their second group of objections, have pointed out a patent ambiguity in the complaint. In one paragraph, the phrase "paper towel cabinets" is defined to limit its use to describe the paper towel cabinets containing the time-stop mechanisms upon which ALSCO holds patents. But in prior and subsequent paragraphs of the complaint, the phrase is used in contexts which would be meaningless nonsense if the definition should obtain. For example, one paragraph of the complaint alleges that Crown agreed in the licensing contract that it would not manufacture, purchase, or lease "other paper towel cabinets" during the continuance of its license to manufacture, purchase, and lease the paper towel cabinets covered by ALSCO's patent. It would seem reasonably clear that the pleader did not intend to allege an agreement denying the same rights which the whole contract was intended to confer. A fair reading of this and other allegations in which the phrase is used serves to indicate with sufficient clarity the sense in which the term is used. Any doubts that may linger fall far short of making the complaint "so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading."

The defendants' motions for more definite statement seek a precision seldom found in the written word. Their objections do not establish that it is unreasonable to require them to plead, and the motion is therefore denied.

### Motion to Dismiss the Individual Defendants.

 Frank G. Steiner and Jonas H. Mayer, ALSCO's President and Vice-President respectively, and Wayne Brown, now Assistant Vice-President and formerly Divisional Sales Manager for Crown, have been joined by the government as defendants in this action. The complaint charges generally that the acts alleged to have been done by the corporate defendants were authorized, ordered, or done by these defendants and other corporate officers and agents. The offenses charged are generally alleged to have been committed by the "defendants" without differentiation between the corporations and the individuals. But no acts are specifically charged to have been done by the individual defendants in their individual capacities. So far as appears from the complaint, their participation in the wrongs complained of was limited to activity in behalf of their respective corporations.

Upon this basis, the three individual defendants have moved for the dismissal of the action as to them, upon the ground that no relief can be granted against them for their conduct in the capacity as corporate officers and agents. Assuming that nothing could be offered at a trial to show any misconduct on their part beyond the scope of their efforts in behalf of their respective corporate employers, it does not follow that they are not proper parties to the litigation. Under the provisions of Rule 65(d), Fed.R. Civ.Proc., the individuals as corporate officers would properly be subject to any injunction that might be entered. In addition to injunctive relief, the complaint also requests declaratory relief establishing the illegality of the practices described. In either aspect, the complaint sets forth a claim upon which some form of relief could be granted against the individual defendants.

The defendants rely upon Hartford-Empire Co. v. United States, 1945, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322, as supporting their motion. There the Supreme Court, in the exercise of its discretionary equity powers, deleted the names of the individual defendants from the terms of an antitrust decree. The Court observed that the individuals had participated in the violations only in their capacities as officers and agents of the corporate defendants. Noting that under the provisions of Rule 65(d) the individuals would be bound by an injunction naming only the corporations in all their activities on behalf of these corporations, the Court found no necessity for naming them in each part of the decree, and no reason to subject them to the tasks and harassment of an injunction if they should subsequently sever their relations with the corporate defendants and engage in a different line of activity. The decision, and the lower court cases that have followed it, establish that relief against individual defendants who have committed violations only in their capacities as corporate agents and officers should be enjoined only in that capacity; there is no suggestion in the cases that no relief can be granted against such individuals.

As the government points out, in the Hartford-Empire case the Court held that the action should be dismissed as against certain individual defendants who had not participated in any capacity in the wrongdoing, but it did not dismiss the action as against those individuals who *had* participated, but only in their capacities as corporate officers and agents; the latter were only entitled to a limitation of the relief to be entered against them. The fact that the scope of relief against the corporations may be broader than the relief available against their respective officers does not avail the defendants. Rule 20, Fed.R.Civ.Proc., provides in part:

"* * * A plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded. Judgment may be given * * * against one or more defendants according to their respective liabilities."

The defendants' reliance upon Gallagher v. Merritt-Chapman & Scott Corp., D.C.N.D.N.Y.1949, 86 F.Supp. 10, appears to be misplaced. Applying the familiar rule that an agent for a disclosed principal is not bound by contracts made on the principal's behalf, the court sustained the agent's motion to dismiss him from an action against him and his principal jointly. But an antitrust violation is not a contract, and the fact that the individual defendants were not personally liable upon the various agreements in restraint of trade alleged in the complaint does not entitle them to be dismissed. Whether the case should be analogized to a tort action, where a servant may be sued jointly with his master, or whether a proceeding under Section 4 of the Sherman Act is sui generis, it is unnecessary to decide. It is enough to overrule the motion that relief against the individuals can be granted. Nor does it appear that they will be prejudiced by being retained as formal parties to the litigation. Whether parties or not, they would be bound by an injunction against their respective corporations in precisely the same way, and, as officers and agents of corporate defendants, they would be treated as parties under the Federal Rules for most purposes. See, for example, Rules 33, 37(b), 37(d), and 43(b), Fed.R.Civ.Proc.

The motion to dismiss the action as to the defendants Steiner, Mayer, and Brown is accordingly denied.

The several defendants are ordered to file their respective answers to the complaint on or before May 10, 1956.