**Robert SCHAEFER and Sandra Schaefer, Plaintiffs-Appellants,**

v.

**FIRST NATIONAL BANK OF LINCOLNWOOD et al., Defendants-Appellees.**

No. 73–2128.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 20, 1974.

Decided Jan. 30, 1975.

Rehearing and Rehearing En Banc Denied April 4, 1975.

S. John Templeton, Lawrence Walner, Harvey Walner, Chicago, Ill., for plaintiffs-appellants.

Jerald P. Esrick, W. Thomas Rosemond, Jr., Michael B. Roche, Stewart S. Dixon, Chicago, Ill., John J. Loflin, New York City, Narcisse A. Brown, Warren E. King, Constantine N. Kangles, Samuel Weisbard, James E. S. Baker, Brimson Grow, Chicago, Ill., Mandel E. Himelstein, Phoenix, Ariz., Gerald Walpin, Rosenman, Colin, Kaye, Petschek, Freund & Emil, New York City, Howard L. Kastel, Chicago, Ill., for defendants-appellees.

Before CASTLE, Senior Circuit Judge, and FAIRCHILD and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

Plaintiffs, private parties suing individually and as a class, appeal from unfavorable summary judgments and orders dismissing their complaint alleging common-law fraud, violations of the Securities Acts and violations of the Sherman and Clayton Antitrust Acts.

The plaintiffs purchased Hercules-Galion Products, Inc. stock during a period of market manipulation between 1965 and 1967. They have based their civil claims on events which were grounds earlier for criminal prosecutions in the Southern District of New York. United States v. Projansky et al., 67 CR 729, aff'd, 465 F.2d 123 (2d Cir. 1972). Named as defendants here were the criminal defendants and the non-indicted co-conspirators of the *Projansky* case [1] and a number of additional non-criminal parties, including several brokerage houses and their salesmen and others. The defendants who are appellees in this appeal include the brokerage house of Rodman & Renshaw; the American Stock Exchange (AMEX) and a group of its specialists, John Rissetto, Al Vernieri, Edward Crooks and Frank Alter; Charles F. Myers, the former president of Hercules-Galion Products, Inc.; Wilbur A. Gorman, chief operating officer of the brokerage house of Link, Gorman & Peck Co.; Arthur Dickholtz, an officer of the First National Bank of Lincolnwood; and Jerry and David Fogelson, partners in Investment Associates. These defendants successfully argued in the district court that the claims against them based on the Securities Acts were time barred and that the antitrust laws do not apply to securities market rigging schemes. Consequently, the district court dismissed the suit against them. These same contentions are at issue on appeal. We reverse in part and affirm in part.

## I

The original complaint in this action alleged substantially the same events as were alleged in the criminal indictment returned in New York. The original complaint sought relief from common law fraud; violations of section 1 of the Sherman Act (15 U.S.C. § 1), sections 1, 4, 5, 12 and 16 of the Clayton Act (15 U.S.C. §§ 12, 15, 16, 22 and 26); sections 15, 16, 17(a), and 22 of the Securities Act of 1933; (15 U.S.C. §§ 77o, 77p, 77q and 77v) and sections 9(a)(2), 10, 27 and 28 of the Securities Act of 1934 (15 U.S.C. §§ 78i, 78j, 78aa and 78bb).

In addition, however, to the sixteen criminal defendants and the six non-indicted co-conspirators, the plaintiffs named the seven brokerage houses employing some of the criminal conspirators. Among these was Rodman & Renshaw, the house which employed Harris Nagorsky, a Chicago broker who from the first figured prominently in the scheme, and Edward Wetzel. Rodman & Renshaw was generally charged in the original complaint with conspiring to defraud the plaintiffs. It was specifically charged with failing to supervise Nagorsky and thereby aiding and abetting the alleged conspiracy, fraud and stock manipulation. The plaintiffs broadened these claims in subsequent pleadings.

Briefly the facts are these.[2] Between July 1, 1965 and August 23, 1967, the sixteen criminal defendants conceived and executed a plan to manipulate the price of Hercules-Galion (Hercules) stock. By a furious promotion campaign, the group was able to raise the price of Hercules stock from $6 to over $14 per share. The heart of the scheme was for the defendants to regularly purchase from among themselves large blocks of Hercules stock on the AMEX at prearranged prices. The price was slowly raised by design, and as public interest and the price increased, the stock was sold and the profits taken.

---

1. These are Irving Projansky, Harry Brainin, Gerald Leavitt and Michael Geier, the four appellants in United States v. Projansky, and Arthur Keller, Stuart Projansky (Irving's son), Fred Weitz, Mark Rolland, Spero Furla, Murray Peltz, Burton Buddy Kozak, Harris Nagorsky, Herbert Werman, Edward Wetzel, Zafe Zafer, and David Zisfein. Named as co-conspirators but not as defendants were Morris and Eva Childs, George Georges, Irving Taub, the First National Bank of Lincolnwood, and Argus Capital Corporation. United States v. Projansky, 465 F.2d 123, 124 n. 1 (2d Cir. 1972).

2. For a complete history of the manipulation scheme consult the Second Circuit's recounting of the facts in United States v. Projansky, *supra* at 124–135.

After the criminal indictments were returned by a New York federal grand jury on August 23, 1967, the allegations were published immediately in many newspapers and news magazines. One and one-half years later, on February 19, 1969, the plaintiffs filed their original complaint. Of those now on appeal, only the defendant Rodman & Renshaw was named in the original complaint.

The first amended complaint was filed on July 25, 1969. Again, of the defendants here on appeal, only Rodman & Renshaw was named. Substantially the same allegations were repeated.

In the fall of 1969, both the plaintiffs and the defendants made the several pretrial motions. The plaintiffs moved for discovery and the defendants sought dismissal of the action. Discovery of the criminal defendants was stayed until their criminal trial was completed. The antitrust claims against the defendants were dismissed. The district court held that the securities acts allegations and the common law fraud allegations stated claims for relief. The court, applying the Illinois five year statute of limitations for fraud, also found the securities acts claims timely.

Subsequently, two events took place setting the stage for this appeal. The first was the end of the criminal trial wherein all of the indicted conspirators were convicted. Discovery resumed and proceeded on schedule, first with the taking of the depositions of the individual criminal defendants followed by that of the brokerage houses' representatives. On October 18, 1972, the plaintiffs filed their amendment to the first amended complaint adding as defendants the AMEX, the specialists, and Myers, Gorman, Dickholtz and the Fogelsons. The second event was this court's decision in Parrent v. Midwest Rug Mills, Inc., 455 F.2d 123 (7th Cir. 1972). In Parrent we held that Rule 10b–5 actions were subject to the three year limitations period contained in the Illinois Securities Act.

At this point, Rodman & Renshaw and all the defendants added in the newly amended complaint moved for summary judgment in the light of the shorter limitations period announced in Parrent. The district court then found the three year period applicable and ordered the dismissal of all three counts, including the securities and common law fraud claims and the antitrust claims which had been re-alleged. This order was made final under Rule 54(b), Fed.R. Civ.P., and is the subject of this appeal. The plaintiffs contend that their suit against Rodman & Renshaw as well as all the other non-criminal defendants is timely, and that the district court erred in dismissing all their claims against the defendants.

II

Plaintiffs contended that they have an implied right of action under section 10(b) of the 1934 Act and Rule 10b–5 and under section 17 of the 1933 Act. The defendants contended that plaintiffs' sole relief lies under section 9 of the 1934 Act. The original complaint stated a claim for relief averring market manipulation of the price of Hercules stock. The defendants argued that section 9(a)(2) specifically prohibits the conduct which the complaint alleges. Arguing that a claim may not be duplicated within the framework of a single act in derogation of its specific limitations, the defendants concluded that the claims based on Rule 10b–5 and section 17 may not be raised in this case.

A

Section 10(b) of the 1934 Act and Rule 10b–5 provide a private claim for relief from market manipulation.[3]

---

3. See 6 Loss, Securities Regulation 3869–73 (Supp. 2d ed. 1969); 3 Loss, Securities Regulation 1763 et seq. (2d ed. 1961). Cf. Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Supt. of Insurance v. Bankers Life & Cas. Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971).

Section 10(b)[4] and Rule 10b–5[5] have been liberally construed by the Supreme Court and include private actions arising from manipulative stock transactions. In Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1971), the Court recognized a private right of action where the claim for relief based on Rule 10b–5 arose from a stock rigging scheme. By fraudulently misstating the prevailing market price of Ute Distribution Corporation stock, the defendant bankers artificially depressed its purchase price. Once they bought the stock, the defendants then sold it at its higher, true market value. Finding this practice unlawful, the Court remarked on the scope of section 10(b) and Rule 10b–5:

> These proscriptions, by statute and rule, are broad and, by repeated use of the word "any," are obviously meant to be inclusive. The Court has said that the 1934 Act and its companion legislative enactments embrace a "fundamental purpose . . . to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." SEC v. Capital Gains Research Bureau, 375 U.S. 180, 186 [84 S.Ct. 275, 11 L.Ed.2d 237] (1963). In the case just cited the Court noted that Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed "not technically and restrictively, but flexibly to effectuate its remedial purposes." *Id.*, at 195 [84 S.Ct. at 285.] This was recent-

ly said once again in Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 12 [92 S.Ct. 165, 169, 30 L.Ed.2d 128] (1971). 406 U.S. at 151, 92 S.Ct. at 1471.

Similarly this Circuit has recognized a private implied right under 10b–5 where the defendant's conduct only threatened to create artificial market conditions. Carroll v. First National Bank of Lincolnwood, 413 F.2d 353 (7th Cir. 1969).

The remedies provided by section 10(b) as well as the other sections of the securities acts are cumulative and not mutually exclusive. In Jordan Building Corporation v. Doyle, O'Connor & Co., 401 F.2d 47 (7th Cir. 1968), this Circuit took what it called the "direct approach" in allowing a private plaintiff to bring an action under Rule 10b–5 although the conduct alleged fell squarely within either section 12 of the 1933 Act or section 15 of the 1934 Act. The defendants contended that the plaintiffs attempted to avoid the limitations period of specifically applicable sections of the securities acts by making their claims under section 10(b) and Rule 10b–5. The defendants went on to argue, as the defendants do here, that the specific sections were exclusive remedies.

Recalling the broad Congressional intent expressed in the language of section 10(b) and the serious remedial purposes of the Acts, the *Jordan* court concluded that the "remedies supplied by and under these acts are cumulative and not mutually exclusive". 401 F.2d at 51. By this same approach, the remedies af-

---

**4.** Section 10(b), 15 U.S.C. § 78j(b), provides:

It shall be unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**5.** Rule 10b–5, 17 C.F.R. 240.10b–5, provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

forded by section 9(a)(2) are not, as the defendants contend, the plaintiffs' sole remedy for market manipulation. The plaintiffs may make their claim for relief under Rule 10b–5 even though the alleged market rigging scheme also falls squarely within section 9(a)(2). Their remedies are cumulative. They may make their claim for relief under either or both or several sections of the acts.

In two cases the Securities and Exchange Commission found a series of stock transactions resulting in an artificial market to be violative of both Rule 10b–5 and section 9(a)(2). In Adams & Co., 33 SEC 444 (1952), the Commission revoked the registration of two broker dealers when they conspired with a third person to raise the price of Mohawk Distillery stock by fraudulently creating apparent activity in the stock on the Chicago Board of Trade. The parties falsified records, reported false bids and offers and engaged in a series of prearranged sales and purchases at increasingly higher prices, causing the price of the stock to become artificially inflated. The Commission found simultaneous violations of sections 10(b), 17(a), 9(a)(2) and Rule 10b–5. In Thornton & Co., 28 SEC 208 (1948), aff'd sub nom. Thornton v. Securities and Exchange Commission, 171 F.2d 702 (2d Cir. 1948), these sections were all found applicable to a single scheme of market manipulation. The facts which supported a section 9(a)(2) claim also gave rise to an equally valid Rule 10b–5 claim. We will leave it to the private plaintiff to make his claims under either Rule 10b–5 or 9(a)(2) or both. The allegations of the pleadings in the case contain elements of both. The Rule 10b–5 claim is therefore appropriate.

### B

The defendants have attacked the sufficiency of plaintiffs' section 17 claim on the grounds that (1) no right of ac-

tion can be implied under section 17 and (2) the parties are not in privity. The defendants' argument has assumed that plaintiffs' Rule 10b–5 claim will be dismissed leaving section 17 to stand alone.

While there is authority in this Circuit for sustaining an implied right of action under section 17 alone,[6] we need not deal directly with this issue. There is an implied right of action under section 10(b) and Rule 10b–5. Judge Friendly's concurrence in SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968), cert. denied, sub nom. Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1968), often cited for denying implication, acknowledged that:

> Once it had been established . . that an aggrieved buyer has a private action under § 10(b) of the 1934 Act, there seemed little practical point in denying the existence of such an action under § 17—with the important proviso that fraud, as distinct from mere negligence, must be alleged. See Fischman v. Raytheon Mfg. Corp., 188 F.2d 783, 787 n. 2 (2 Cir. 1951); Weber v. C. M. P. Corp., 242 F.Supp. 321, 322–325 (S.D.N.Y.1965) (Wyatt, J.); Thiele v. Shields, 131 F.Supp. 416, 419 (S.D.N.Y.1955) (Kaufman, J.). 401 F.2d at 867.[7]

Since fraud as well as negligence has been alleged and the section 10(b) claim established, plaintiffs' section 17 claim will be allowed to stand.

Similarly, we need not deal with defendants' contention that section 17 has a privity requirement. Where section 17 has been concurrently pleaded with a sufficient Rule 10b–5 claim, as here, courts forbear to rule on the sufficiency of the section 17 claim. 6 Loss, Securities Regulation 3913 (Supp. 2d ed. 1969).

### III

Every defendant appealing here has contended that the statutory period

---

**6.** Surowitz v. Hilton Hotels Corporation, 342 F.2d 596, 604 (7th Cir. 1965), rev'd on other grounds, 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966). *But compare* Reid v. Mann, 381 F.Supp. 525 (N.D.Ill.1974), and authorities cited there.

**7.** *See also* Dauphin Corp. v. Redwall Corp., 201 F.Supp. 466, 469 (D.Del.1962).

within which to bring a Rule 10b–5 action is three years. Each has further contended that this period expired before the plaintiffs' filed their various complaints. Since the defendants stand in different factual circumstances, they must be dealt with separately.

This Circuit determined in Parrent v. Midwest Rug Mills, 455 F.2d 123 (7th Cir. 1972), that Rule 10b–5 and section 17 actions arising in Illinois were subject to a three year statute of limitations. Since no federal provision limits Rule 10b–5 actions, the *Parrent* court looked to the law of the forum state, Illinois, for the statute of limitations which best effectuated the policies of Rule 10b–5 and section 17. This was held to be the three year limitation found in section 13 of the Illinois Securities Law.

The plaintiffs contend that Illinois' five year statute of limitations for fraud applies. Judge Decker applied this limitation at an earlier stage in this litigation before the *Parrent* case was decided. Subsequently Judge McMillen, succeeding Judge Decker in this action, found the three year limitation applicable on the basis of *Parrent*. The plaintiffs urged that the five year limitation is "the law of the case." They also argued that Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), precluded retrospective application of *Parrent*.

■ The doctrine of the law of the case did not bind Judge McMillen to apply the five year limitations period. Federal rule of the case doctrine is a rule of practice. It does not limit a court's power. Messenger v. Anderson, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912); Drinan v. A. J. Lindermann & Hoverson Co., 238 F.2d 72, 74 (7th Cir. 1956). A district judge has the power to undo the work of his predecessor in the same action. Bowles v. Wilke, 175 F.2d 35 (7th Cir. 1949).[8]

■ Although the parties there did not raise the issue of retroactivity, we applied *Parrent* retroactively in Hupp v. Gray, 500 F.2d 993 (7th Cir. 1974). Under *Chevron, supra*, the doctrine of nonretroactivity is applied when those invoking it receive favorable consideration on three separate factors. As set out by the Supreme Court these are:

In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, see, e. g., Hanover Shoe, Inc. v. United Shoe Machinery Corp., *supra*, 392 U.S. [481], at 496 [88 S.Ct. 2224, at 2233, 20 L.Ed.2d 1231], or by deciding an issue of first impression whose resolution was not clearly foreshadowed, see, e. g., Allen v. State Board of Elections, *supra* [393 U.S. 544], at 572 [89 S.Ct. 817, at 835, 22 L.Ed.2d 1]. Second, it has been stressed that "we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." Linkletter v. Walker, *supra* [381 U.S. 618], at 629 [85 S.Ct. 1731, at 1738, 14 L.Ed.2d 601]. Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity." Cipriano v. City of Houma, *supra* [395 U.S. 701], at 706 [89 S.Ct. 1897, at 1900, 23 L.Ed.2d 647]. Chevron v. Huson, 404 U.S. at 106–107, 92 S.Ct. at 355.

The first factor for consideration is decisive. Although the statute of limita-

---

8. The rule of the law of the case may have a different effect upon a federal court in a diversity case where a state court has previously acted. Barrett v. Baylor, 457 F.2d 119, 123–124 (7th Cir. 1972).

tions issue was one of first impression in *Parrent,* the *Parrent* court did not overrule "clear past precedent." The court said:

> It is clear that under the resemblance test the three year limitation in Section 13, subd. D of the Illinois Securities Law (Ill.Rev.Stat. ch. 121½, § 137.13, subd. D) applies to the 10b–5 actions stated in Counts I and II.

> The three year limitation is . . closer to the express limitation periods in the various sections of the federal act . . . . Furthermore, logic dictates selection of the three year Illinois limitation as tending more toward an orderly development of law, than reaching into a different Illinois Act (Ill.Rev.Stat. ch. 83, § 16) for the appropriate limitation. 455 F.2d at 127.

Before *Parrent,* circuit courts forced to choose between a state's fraud or Blue Sky statute of limitation used the "resemblance test." Charney v. Thomas, 372 F.2d 97 (6th Cir. 1967); Vanderboom v. Sexton, 422 F.2d 1233 (8th Cir.), cert. denied, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970). They looked to the limitations period of the state action which was most like section 10(b) or Rule 10b–5. Ruder, Limitations on Civil Liability Under Rule 10b–5, 1972 Duke L.J. 1125, 1142–50 (1972); Note, Parrent v. Midwest Rug Mills, Inc.: Statute of Limitations Under Section 10(b), 68 Nw. U.L.Rev. 162 (1973).

■ It is apparent from a reading of section 12 of the Illinois Securities Law (Ill.Rev.Stat., ch. 121½, § 137.12), for which section 13 supplies the three year limitation, that it closely parallels Rule 10b–5 and a study of the Illinois Securities Laws reveals a nearly identical aim. *Parrent, supra,* 455 F.2d at 127. Circuits which do not apply Blue Sky limitations either have higher standards for proof of scienter or dissimilar state securities statutes. Martin, Statute of Limitations in 10b–5 Actions: Which State Statute is Applicable?, 29 Bus.L. 443 (1974). Clearly, application of the Illinois Blue Sky limitations period was foreshadowed, and in any event *Parrent* did not constitute

an overruling of any clear past precedent of the Seventh Circuit.

Furthermore, following the rule in *Parrent* is not detrimental to the operation of Rule 10b–5 in this case inasmuch as the plaintiffs may and do call upon the mitigating doctrine of tolling. Equitable tolling is always available where fraud has concealed the wrong done. See part IV, *infra.* Since *Chevron* does not operate here, *Parrent's* three year limitations period applies retroactively.

## IV

The defendants have challenged the plaintiffs' reliance on the theory of equitable tolling on two grounds: (1) that tolling does not apply to claims based on negligence and (2) that the allegations of the complaints are insufficient to toll the limitations period.

### A

Rodman & Renshaw, named a defendant along with six other brokerage houses in the original complaint of February 19, 1969, had employed Harris Nagorsky, one of the parties indicted in August 1967. During the period he was with Rodman, Nagorsky participated in the planning of the manipulation scheme, but he left in October 1965 before the scheme had run its course. Rodman contended that the limitations period ran from the time Nagorsky left its employ. This would mean that the original complaint was time barred by more than three months. The plaintiffs, however, claimed that the limitations period began to run in 1967. They argued that the period between 1965 and 1967 was tolled and that the statute of limitations did not begin to run until the alleged fraud was discovered when the New York indictment was returned.

■ Federal courts have long recognized the theory of equitable tolling in fraud actions. Clearly, it is available to claimants in Rule 10b–5 actions. In *Parrent* the court said:

> We must read into the three year limitation applied in the Rule 10b–5

count the "equitable doctrine" that the statute does not begin to run until the fraud is discovered where a plaintiff injured by fraud "remains in ignorance of it without any fault or want of diligence or care on his part . . . ." 455 F.2d at 128. In Hochfelder v. Midwest Stock Exchange, 503 F.2d 364, 375 (7th Cir. 1974), Chief Judge Swygert said:

The equitable tolling doctrine provides that where a fraud which is the foundation of the suit has actively been concealed or is of such a nature as to conceal itself, the statute of limitations is tolled until the plaintiff has obtained knowledge of the fraud or in the exercise of due care should have obtained knowledge of the fraud. Bailey v. Glover, 88 U.S. (21 Wall.) 342, 349, 22 L.Ed. 636 (1874); Holmberg v. Armbrecht, 327 U.S. 392, 396, 66 S.Ct. 582, 90 L.Ed. 743 (1945); Morgan v. Koch, 419 F.2d 993, 997 (7th Cir. 1969).

The federal tolling doctrine operates both against those who commit the alleged fraudulent acts and those who negligently facilitate fraud. The defendants have claimed that the tolling doctrine only operates against those who commit the fraud. They sought to find support in Bryan v. United States, 99 F.2d 549, 552 (10th Cir. 1938), cert. denied, 305 U.S. 661, 59 S.Ct. 364, 83 L.Ed. 429 (1939), and Hayden v. Thompson, 71 F. 60 (8th Cir. 1895), both fraud actions. *Bryan* is no support because the fraud suit was dismissed upon the defense of sovereign immunity where the defendant employer was the United States Government. Application of the tolling doctrine to a negligent employer was not an issue. Neither does *Hayden* lend any support to the defendants' argument. In *Hayden*, the plaintiff, a customer, sued to recover fraudulently distributed dividends from a . bank, its directors and shareholders. The court held that equitable tolling did not apply to one of the bank's shareholders since neither a fraud nor a negligence claim had been alleged against him. The plaintiff's claims against the other shareholders and the directors were held to be timely on the theory of equitable tolling.

Equitable tolling embraces defendants such as Rodman & Renshaw who have facilitated by their negligence a Rule 10b–5 fraud. Chief Judge Swygert continued in Hochfelder v. Midwest Stock Exchange, *supra*, 503 F.2d at 375–376:

If claims brought in the same posture as the instant action—asserting charges amounting to negligence but short of fraud—are to have any vitality, it cannot be contended that the tolling doctrine should not apply. Often the underlying fraud, carefully concealed in and of itself, would cloak the implementing actions of others. Accordingly, where the acts of a defendant facilitate the perpetration of a concealed fraud of another, the bar of the statute of limitations should not begin to run until a plaintiff obtains knowledge or through due diligence should have obtained knowledge of the underlying fraud.

This passage was cited approvingly in Hochfelder v. Ernst & Ernst, 503 F.2d 1100, 1119 (7th Cir. 1974), where equitable tolling was held to operate against the accounting firm of Ernst & Ernst for negligent facilitation and implementation of fraud although that firm was not chargeable with acts of fraud or fraudulent concealment.

Clearly, the action of Rodman & Renshaw fell within the ambit of equitable tolling. In their original claim for relief the plaintiffs alleged direct participation in the conspiracy to manipulate the price of Hercules stock as well as negligent facilitation. Even as equitable tolling works to prevent the defrauder from taking advantage of his wrongdoing, it also works to prevent the negligent person from taking advantage of his carelessness.

B

The plaintiffs' allegation of fraudulent concealment is sufficiently specific to support a request for equitable tolling. The defendants contended

that the plaintiffs merely alleged their ignorance of the fraud. They claimed that the plaintiffs must allege their own diligence as well.

 When pleading Rule 10b–5 fraud, plaintiffs must comply with Rule 9(b), Fed.R.Civ.P.[9] Once the underlying fraudulent practices are correctly pleaded, plaintiffs may then avail themselves of equitable tolling. The allegations of the pleadings here stated with particularity the circumstances of the conspiracy to defraud the purchasers of Hercules stock through market rigging. They were drawn primarily from the lengthy criminal indictment and were a detailed basis from which to claim fraudulent concealment. In paragraph 27 of the original complaint, the plaintiffs first alleged under the heading "Fraudulent Concealment" their own ignorance of the fraud until its discovery in 1967. They then stated:

> Plaintiffs and members of the class could not have discovered the combination, conspiracy, and other fraudulent acts at an earlier date by the exercise of due diligence since the combination, conspiracy, and fraudulent acts set forth herein had been fraudulently concealed by the defendants by various means and methods used to avoid the detection thereof.

In paragraph 25 of the first amended complaint they added:

> [T]he action is brought within one year after the discovery of the untrue statements and omissions of material facts alleged herein, and within one year after such discovery should have been made by the exercise of reasonable diligence . . ..

Furthermore, throughout the pleadings plaintiffs gave details of the active, continuous concealment of the fraud and have supported with discovery testimony their diligence.

 Clearly the plaintiffs have alleged all the necessary elements of fraudulent concealment. In Baker v. F&F Investment, 420 F.2d 1191 (7th Cir. 1970), the court laid down the proper test:

> In order to obtain the shelter of the federal doctrine of fraudulent concealment, plaintiffs must be prepared to adduce sufficient evidence to warrant the conclusion that defendants concealed the basic facts disclosing the existence of a cause of action and that plaintiffs remained in ignorance of those facts through no fault of their own. 420 F.2d at 1199.

 The plaintiffs have expressly alleged that they did not know of Rodman & Renshaw's involvement until the criminal indictment in United States v. Projansky, *supra*, was returned in August 1967. All of the plaintiffs deposed testified that they first learned of the rigging scheme either upon the publication given to the indictment or later from friends or their attorneys. The plaintiffs also alleged and deposed that the criminal conspirators concealed the fraud from them. There is ample discovery testimony showing that the conspirators gave the plaintiffs with whom they directly dealt misleading information, hiding from them at all times the true nature of their stock transactions. This testimony also stands uncontradicted. Finally by implication as well as expressly, the plaintiffs have alleged that their delayed discovery of the fraud was not their fault. A complaint when tested by summary procedures must be given the benefit of every possible implication. United States v. Crown Zellerbach Corp., 141 F.Supp. 118 (N.D.Ill.1956).

The discovery testimony of Robert Schaefer supported his claims. During the fall of 1965, he repeatedly telephoned Nagorsky and defendant Epstein and questioned them concerning the value and future of Hercules stock. The defendants have not put Schaefer's testimony into question.

---

9. "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be, stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

Nor did the plaintiffs realize that Myers, Gorman and the Fogelsons might be participants in the manipulation scheme until 1972. These defendants were not indicted nor mentioned in the criminal indictment. In no way could the plaintiffs have known the part these defendants played until they had deposed the criminal defendants. Since discovery of the indicted conspirators was stayed until after their criminal trial, the plaintiffs were first able to take their testimony in the latter months of 1971. They did so promptly. By deposing Spero Furla, the plaintiffs learned of the meeting between five of the conspirators and Charles Myers, the president of Hercules-Galion, at the Hercules plant in the fall of 1965 after the market rigging plan had been put into operation. They also found that Myers was fully aware of the manipulation. By deposing Buddy Kozak, the plaintiffs learned of his activities while an employee of Link, Gorman & Peck and his relationship to its chief operating officer, Wilbur Gorman. By deposing Mark Rolland, they learned of David Fogelson's involvement.

■ In brief, the plaintiffs' Rule 10b–5 claims against Rodman & Renshaw, Myers, Gorman, Dickholtz and the Fogelsons are timely.[10] The complaint as amended alleged with particularity the conspiracy to manipulate Hercules stock and stated all the necessary elements of defendants' fraudulent concealment. Equitable tolling must apply. The plaintiffs discovered the existence of the fraud in August 1967. The three year limitations period commenced running then for Rodman & Renshaw. One and one-half years later, in February 1969, the original complaint was filed naming Rodman & Renshaw among other brokerage houses. The plaintiffs discovered the roles which Myers, Gorman, Dickholtz and the Fogelsons played between November 1971 and March 1972. The limitations period then began running for these defendants. Less than a

year later, in October 1972, the plaintiffs amended the complaint and added their names as parties-defendant.

The district court's orders granting judgment on the pleadings to defendant Rodman & Renshaw and summary judgment to defendants Myers, Gorman, Dickholtz and the Fogelsons are reversed. The district court will have jurisdiction over the pendent common law fraud claims. United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

### C

■ Plaintiffs' action against the American Stock Exchange and its specialists is time barred. These defendants were first named in the amendment to the first amended complaint which was filed three and one-half years after the original complaint and more than five years after the criminal indictments. The plaintiffs contend that the AMEX and its specialists aided and abetted the manipulation scheme through lack of proper supervision.

The plaintiffs argued that they could only have discovered the AMEX's negligence after taking the following depositions from the brokerage houses:

(1) Deposition of Defendant Hertz-Warner & Co. per Irving Hertz 6/27/72 pp. 19 et seq.; and Henry Warner 6/27/72 pp. 83 et seq.

(2) Deposition of Defendant Edward Wetzel 5/25/72, pp. 81 se seq. [sic.].

(3) Deposition of Defendant Reynolds & Co., per Anthony H. Englese 6/29/72 pp. 53 et seq.

(4) Deposition of Defendant Hornblower & Weeks, Hemphill, Noyes per William J. Lawlor, Jr. 8/1/72 pp. 59–61.

(5) Deposition of Defendant Link, Gorman & Peck per Wilbur A. Gorman 8/15/72 p. 21 and per June E. Carlson 7/6/72 pp. 69, 70. (Plaintiffs' Brief, p. 26.)

---

**10.** The record is not clear as to whether Dickholtz and the Fogelsons were parties to the original order of dismissal dated June 25, 1973, but the district court expressly included them in the "clarification" order of September 13, 1973.

These depositions were taken after the criminal trial and after the plaintiffs had first deposed the criminal defendants. This discovery sequence, the plaintiffs believed, gave them a strategical advantage over the brokerage houses. Once the brokerage houses were deposed, the plaintiffs added the AMEX and its specialists to their list of defendants in October 1972.

The plaintiffs delayed discovery of the brokerage houses for too long. The criminal indictment stated that the criminal defendants were certified to trade securities on the AMEX, that they manipulated a stock registered with the AMEX, and that the manipulation took place on the floor of the Exchange itself. Also, the plaintiffs could have preliminarily deposed the brokerage houses on the behavior of the AMEX before the criminal trial. All of the depositions which the plaintiffs list above as essential to discovering the role which the AMEX and its specialists played during the stock rigging (except that of Wetzel) could have been taken before the criminal trial. The stay of discovery order was directed only to the indicted conspirators. Finally, gaining a strategical advantage is not a sufficient reason for delaying five years before naming these defendants. The sum of information the plaintiffs had concerning the AMEX before taking discovery of the brokerage houses was not increased by the 1971 and 1972 depositions. The three year limitations period had expired. The amendment to the first amended complaint came too late insofar as the AMEX and its specialists, John Rissetto, Al Vernieri, Edward Crooks and Frank Alter, were concerned.

The order of the district court granting summary judgment to the AMEX and its specialists must be affirmed.

### V

The district court properly dismissed the plaintiffs' antitrust claims. At the start of this action the plaintiffs included a claim under section 1 of the Sherman Act, 15 U.S.C. § 1. Judge Decker dismissed it against the original brokerage house and criminal defendants. Schaefer v. First National Bank of Lincolnwood, 326 F.Supp. 1186 (N.D.Ill. 1970). Subsequently, on the basis of Judge Decker's opinion, Judge McMillen dismissed it against the non-criminal defendants.

The plaintiffs contended that the conspiracy to create and maintain an artificial trading price for Hercules stock on the AMEX was price fixing and a per se violation of the Sherman Act prohibition against conspiracies and combination to fix and maintain the price of goods in interstate commerce. The plaintiffs argued that the district court should not have dismissed the antitrust claims because the defendants' manipulatory practices fall within the literal language of the Sherman Act.

Securities exchanges do not enjoy a blanket exemption from the antitrust laws. In Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), the Supreme Court held that the antitrust laws do apply to exchanges and made such an assumption the starting point for any analysis of a conflict arising from their collision with the securities laws. The Court said at 357, 83 S.Ct. at 1257:

> The Securities Exchange Act contains no express exemption from the antitrust laws or, for that matter, from any other statute. This means that any repealer of the antitrust laws must be discerned as a matter of implication, and "[i]t is a cardinal principle of construction that repeals by implication are not favored." United States v. Borden Co., 308 U.S. 188, 198 [60 S.Ct. 182, 188, 84 L.Ed. 181]; see Georgia v. Pennsylvania R. Co., 324 U.S. 439, 456–457 [65 S.Ct. 716, 725–726, 89 L.Ed. 1051]; California v. Federal Power Comm'n, 369 U.S. 482, 485 [82 S.Ct. 901, 903, 8 L.Ed.2d 54]. Repeal is to be regarded as implied only if necessary to make the Securities Exchange Act work, and even then only to the minimum extent necessary.

This is the guiding principle to reconciliation of the two statutory schemes.

In fact, the antitrust laws are a necessary complement to the regulatory scheme of the securities acts. As the *Silver* Court said:

> Since the antitrust laws serve, among other things, to protect competitive freedom, i. e., the freedom of individual business units to compete unhindered by the group action of others, it follows that the antitrust laws are peculiarly appropriate as a check upon anticompetitive acts of exchanges which conflict with their duty to keep their operations and those of their members honest and viable. 373 U.S. at 359, 83 S.Ct. at 1258.

Although the *Silver* case was distinguished, its further operation was seriously questioned by the Supreme Court's opinion in Ricci v. Chicago Mercantile Exchange, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973), holding that an antitrust action against a commodity exchange should be stayed to afford the Commodity Exchange Commission an opportunity to determine if the challenged conduct of the exchange was in compliance with the applicable statute and with exchange rules. *See also* Chicago Mercantile Exchange v. Deaktor, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973).

■ Private parties may only bring antitrust claims against an exchange or its members when there is no other vehicle for review. In *Silver,* the Court allowed a private antitrust suit because the Securities and Exchange Commission was not granted any statutory means under the securities acts for reviewing a New York Stock Exchange order terminating direct wire telephone connections with non-members. The Court added in a footnote (373 U.S. 358 n. 12, 83 S.Ct. 1257) that "[w]ere there Commission jurisdiction *and ensuing judicial review* for scrutiny of a particular exchange ruling . . ., a different case would arise concerning exemption from the operation of laws designed to prevent anticompetitive activity . . .." (emphasis added).

The plaintiffs here have a forum for review unlike the plaintiffs in *Silver.* The plaintiffs have chosen to make claims both under section 10(b) and section 17 of the securities acts and under the antitrust laws.

■ By electing to make their claim for relief under the securities acts, the plaintiffs have rendered their antitrust claims superfluous. The sort of manipulation scheme underlying the plaintiffs' claim here was envisioned to be fully dealt with under the securities acts. 3 Loss, Securities Regulation 1529–70 (2d ed. 1961). The plaintiffs' Sherman and Clayton antitrust claims are dismissed for these reasons and for those appearing in Judge Decker's opinion, 326 F.Supp. 1186, 1190–1192.

In summary, (1) we affirm the district court's dismissal of Count II (antitrust claims) as to all parties; (2) we affirm the district court's dismissal of Counts I (securities acts claims) and Count III (common law fraud claims) as to the American Stock Exchange, John Rissetto, Al Vernieri, Edward Crooks and Frank Alter; but we reverse the court's dismissal of Counts I and III as to all other defendants. The case is remanded for further proceedings consistent herewith.

Reversed in part; affirmed in part; and remanded.

FAIRCHILD, Circuit Judge (concurring).

I agree in almost all respects with the opinion ably written for the court by Judge Sprecher. With respect to Part V (dismissal of the antitrust claims), the most persuasive argument seems to me to arise out of the contrast between the relevant language of the Securities Exchange Act and that of the antitrust laws. Although it is arguable whether or not, before the enactment of the Securities Exchange Act, the manipulation specifically described in § 9(a)(2), 15 U.S.C. § 78i, fell within the far more general language of § 1 of the Sherman Act, 15 U.S.C. § 1, the later enactment not only specifically described the activi-

ty (expressly including acting "with one or more other persons," as well as "alone") and declared it unlawful, but in § 28(a), 15 U.S.C. § 78bb(a), very closely limited the recovery for violation, i. e., actual damages under the Securities Exchange Act, contrasted with treble damages under the antitrust laws, 15 U.S.C. § 15. Under all the circumstances, it seems to me the more logical conclusion that the later enactment was either an implied amendment of the earlier, or was itself recognition by Congress that the activity described in § 9(a)(2) of the Securities Exchange Act had not previously been prohibited by the antitrust laws.