Marc Logan CONLEY, Plaintiff,

v.

FIRST JERSEY SECURITIES, INC., a New Jersey corporation, and Robert Chonski, Defendants.

Civ. A. No. 81–324.

United States District Court, D. Delaware.

July 13, 1982.

George H. Seitz III, of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., for plaintiff.

Edward M. McNally of Morris, James, Hitchens & Williams, Wilmington, Del., and Ronald J. Riccio of Robinson, Wayne, Greenberg, Levin, Riccio & La Sala, Newark, N. J., for defendants.

## MEMORANDUM OPINION

LATCHUM, Chief Judge.

The plaintiff, Marc Conley ("Conley"), an individual residing in New Castle, Delaware, filed on July 17, 1981, a three count complaint against defendants First Jersey Securities, Inc. ("First Jersey"), and Robert Chonski. The first count alleges that the "defendants engaged in acts, practices and courses of conduct which operated as a fraud, deceit, fraudulent scheme or device upon plaintiff in violation of Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act") and Rule 10b–5 promulgated thereunder."[1] (Docket Item ["D.I."] 1, ¶ 7.) The second count alleges a state law claim that the defendants, as brokers, breached the fiduciary duty they owed to the plaintiff, including the obligations of full fairness, good faith, complete candor and honesty. (D.I. 1, ¶ 17.) In the third count, the plaintiff alleges a state law claim that the defendants knowingly or with reckless disregard of the truth made representations of material fact and omissions of material fact which plaintiff justifiably relied upon, causing him damage. (D.I. 1, ¶¶ 22–25.) The defendants deny the plaintiff's allegations and assert seven affirmative defenses. One of those defenses is that the claims involving the purchase of two of four corporate shares by plaintiff are barred by the statute of limitations. (D.I. 18 at 3.) First Jersey presently moves, pursuant to Rule 56, F.R.Civ.P., for partial summary judgment on the ground that the statute of limitation bars the plaintiff from asserting that two of the stock transactions violated the Exchange Act. (D.I. 17; D.I. 18 at 2.)

## I. FACTS

Accepting the evidence and the inferences therefrom in the most favorable light to the plaintiff, the non-moving party, *Smith v. Pittsburgh Gage and Supply Co.*, 464 F.2d 870, 874 (C.A. 3, 1972), the following pertinent facts appear of record:

Conley first met with Chonski, an employee of First Jersey, on May 18, 1979, at the offices of First Jersey, located in Delaware. At that time, Conley desired to sell some stock in order to purchase Caesar's World common stock. During this meeting, Chonski recommended that Conley purchase shares of Cavanaugh Communities ("Cava-

---

**1.** Jurisdiction exists by virtue of § 27 of the Act, 15 U.S.C. 78aa *et seq.* and jurisdiction over the state claims is based on pendent jurisdiction.

naugh"), a corporation for which First Jersey functioned as a market maker. (D.I. 9 at 6; D.I. 16, ¶ 15.) Chonski showed Conley the plans for a casino to be built by Cavanaugh. (D.I. 16, ¶ 15; D.I. 9 at 6.) He said financing had been arranged through a British or European bank and that the casino was to be built right away because the financing was completed. Plaintiff wanted to buy stock of Caesar's World, but Chonski kept encouraging Conley to diversify stating that Cavanaugh was a better deal. At the conclusion of the May 18 meeting, the plaintiff, in reliance on Chonski's representations, bought 50 shares of Caesar's World and 750 shares of Cavanaugh. (D.I. 9 at 7.)

On June 12, 1979, Chonski telephoned the plaintiff and solicited Conley to purchase shares of ECKO Electronics ("ECKO") which Chonski called "a sure thing to go up." First Jersey, again, functioned as a market maker for ECKO, and Chonski suggested to Conley that Conley buy several thousand shares with the sale of Caesar's World and Cavanaugh. (D.I. 16, ¶ 15; D.I. 9 at 7.) Conley told Chonski that he wanted to invest only the amount of his original investment and retain the profits. Chonski stated that Conley's investment strategy was not a good one because the ECKO stock would increase in value over a short time. The plaintiff agreed and purchased 7,000 shares of ECKO on that date with funds used from the sale of Caesar's World and Cavanaugh. (D.I. 9 at 7.)

Around the middle of July, Chonski suggested buying shares of Rampart General ("Rampart"), a corporation for which First Jersey again functioned as a market maker. Chonski told Conley that this company manufactured prefabricated fireplaces that could be installed by a couple of men in one day. He claimed that it was a new product and that franchises or distributors were springing up everywhere. He claimed that the stock was sure to increase by at least one-half, and that if the plaintiff sold his shares of Exxon, GM, Mobil, Getty and Simmons, he could buy 10,000 shares of Rampart and make around $5,000 in a short period of time. Chonski never told the plaintiff that First Jersey made a market in

Rampart. On July 18, 1979, Conley sold his Simmons, Exxon, GM, Mobil, and Getty Oil stock, and invested $42,500 for 10,000 shares of Rampart. Chonski told the plaintiff there was no commission charged on this purchase. (*Id.* at 8.)

On July 20, 1979, the plaintiff went to Chonski's office and, at that time, Chonski showed him a new product made by URT Industries ("URT"), a corporation for which First Jersey functioned as a market maker. The product was a gold colored disc which Chonski represented to be a video disc, a new idea in home entertainment. Chonski said that URT's distribution of video discs was to start in the very near future. Chonski recommended selling Conley's shares of ECKO to buy shares of URT. In reliance on Chonski's representations, the plaintiff told him that he would like to go ahead with this transaction, but again, that he would like to retain the profits that he had made. Chonski again claimed that this would be unwise because URT was again, "a sure thing." Chonski did not tell the plaintiff First Jersey made a market for URT stocks; but told the plaintiff there was no commission charged on the purchase. (*Id.* at 9.)

At the time the plaintiff purchased or sold the above-mentioned stocks, Chonski did not provide him with any written material other than confirmation slips. Subsequent to these transactions, the plaintiff acquired further information on the stocks which he traded, but none of this material came through Chonski.

Conley alleges that the defendants engaged in acts, practices and courses of conduct which operated as a fraud, deceit, fraudulent scheme or device upon the plaintiff in violation of Section 10(b) and Rule 10b–5. Specifically, he alleges that in the conversations preceding the May 18th purchase of Cavanaugh, the June 12th purchase of ECKO, the July 18th purchase of Rampart, and the July 20th purchase of URT, the defendants made or caused to be made false and misleading statements of material facts to Conley with the purpose

and intention of inducing Conley to acquire the stock the defendants were soliciting sales as a market maker. Defendant First Jersey argues that those purchases of Cavanaugh and ECKO stocks which occurred prior to July 17, 1979, are barred by the two-year limitation imposed by the Delaware Blue Sky Law, 6 *Del.C.* § 7323(e). Conley, however, argues that his claims are not governed by the two-year limitation imposed under the Blue Sky Law, but by the three-year limitation period imposed by 10 *Del.C.* § 8106. Further, Conley argues that if the two-year limitation applies, the limitation period was tolled because of the doctrine of fraudulent concealment. Finally, Conley argues that, in any event, the Court should not grant defendant's partial summary judgment motion because the Court should exercise its discretion to retain jurisdiction over the same state law claims involving the Cavanaugh and ECKO stock on the theory that they arise out of the same common nucleus of operative facts and would ordinarily be expected to be presented in one judicial proceeding.[2]

## II. STATUTE OF LIMITATIONS

Defendant First Jersey relies upon this Court's opinion in *Hill v. Der*, 521 F.Supp. 1370 (D.Del.1981), for the proposition that the portion of Count I which alleges violations of Section 10(b) and Rule 10b–5 is barred by the statute of limitations contained in Delaware's Blue Sky Law. In *Hill*, several allegedly defrauded buyers brought suit against sellers of securities, claiming violations of Section 10(b) and Rule 10b–5. Presented with motions to dismiss based on the statute of limitations, the Court ruled that the timeliness of Rule 10b–5 actions is measured by reference to state law and that the state statute of limitations which best effectuates the policies advanced by Rule 10b–5 must be applied. The Court also observed that in making this determination, courts "often look to the state cause of action which bears the closest substantive resemblance to Rule

10b–5 and apply the limitations provision applicable to that action." *Id.* at 1379.

In *Hill*, as in this case, the Court was faced with two alternatives from which to select an appropriate statute of limitations period to govern the 10b–5 claims—the two-year limitation period provided by the Delaware Blue Sky Law and the three-year limitation period provided for common law fraud actions. In determining which of these limitation periods should be applied, the Court discussed in depth *Roberts v. Magnetic Metals Co.*, 611 F.2d 450 (C.A. 3, 1979), and *Biggans v. Bache Halsey Stuart and Shields*, 638 F.2d 603 (C.A. 3, 1980), in which the Court of Appeals for the Third Circuit addressed the appropriate limitation periods to be applied in federal securities cases. After closely examining these two opinions, this Court concluded:

It is safe to assume that the Third Circuit adheres to the rudimentary principle that when alternative limitations periods are supplied by state law, the court must select that state statute of limitations which best comports with the substantive federal policies advanced by Rule 10b–5. Likewise the Court of Appeals has indicated that the concurrent operation of the federal and state securities statutes makes the Blue Sky statute of limitations in most cases the logical candidate for regulating 10b–5 claims. This presumption, however, is subject to one significant exception. If the underlying state Blue Sky law does not afford a civil damage action to remedy the behavior challenged by the 10b–5 claim and the plaintiff would be relegated to a common law fraud action for state relief, the courts must apply the fraud limitations provision to the 10b–5 action. *Accord Sharp v. Coopers & Lybrand*, 649 F.2d 175, 191–92 (C.A.3, 1981); *McNeal v. Paine, Webber, Jackson & Curtis, Inc.*, 598 F.2d 888, 894 (C.A.5, 1979). Beyond these constraints, however, the district courts are free to fill the interstices left open by Congress' failure to enact a limi-

**2.** Defendant does not seek partial summary judgment on the state law claims, therefore,

pendant jurisdiction need not be discussed at this time. *See* D.I. 28 at 7 n.4.

tations provision for remedies implied under the securities laws.

521 F.Supp. at 1383.

The Court then found that application of the Blue Sky limitations provision to the 10b–5 claims in the complaint reflected "the more sensible approach." *Id.* at 1384. The allegedly defrauded plaintiffs had a cause of action against the defendants under Section 7323 of the Blue Sky Law. Although the Court observed that Section 7323 and Rule 10b–5 were not coextensive, it concluded that the two provisions shared a marked similarity in purpose and substance sufficient to overcome any technical differences. *Id.* In contrast, the Court reasoned that the concerns shared by suits based on 10b–5 and common law fraud were far less congruent: Securities fraud was only one category of the wide range of activity generally encompassed within common law fraud. *Id.* Accordingly, the Court ruled that the Blue Sky limitations period best effectuated the policies advanced by Rule 10b–5. *Id.*

The plaintiff in the present case does not challenge *Hill's* finding that Section 7323 and Rule 10b–5 bear a marked similarity in purpose and substance. Rather, Conley argues that he does not have a cause of action under Section 7323 and thus attempts to distinguish himself from the *Hill* plaintiffs. Conley argues that the Blue Sky provisions do not grant him a private cause of action against the defendants because they are merely stockbrokers, and are not subject to liability under Section 7323(a)(2). (D.I. 26 at 11–12.) [3] In support of this argument, Conley relies upon *Biggans, supra,* where the seller-plaintiff sought to recover damages from his broker for "churning" his account. The brokerage firm argued that

the seller's claim was governed by the Pennsylvania Blue Sky Law because churning was an area encompassed within the Pennsylvania Securities Act. The Court concluded, however, that the broker could not be sued for damages because he was not the purchaser and that the exclusive remedy of rescission would be unavailing in a suit against a broker for churning. *Id.* Thus it held that the Blue Sky provisions were inapplicable to the seller's claim.

■ Conley argues that the *Biggans* rationale is dispositive of the facts presented in this case. He argues that First Jersey and Chonski acted as his broker, thus were not offerors, sellers, or purchasers as defined by the provisions of the Blue Sky Law. The Court disagrees because First Jersey was a market maker for Cavanaugh and ECKO. A market maker has been defined by SEC Rule 17a–9(f)(1), 17 C.F.R. § 290.17a–9(f) as follows:

> (1) The term "market-maker" shall mean a dealer who, with respect to a particular security, holds himself out (by entering indications of interest in purchasing and selling in an inter-dealer quotations system or otherwise) as being willing to buy and sell for his own account on a continuous basis otherwise than on a national securities exchange.

Bloomenthal in *Securities and Federal Corporate Law* § 12.03[2] (1981), *quoting* Report of Special Study of Securities Markets of the Securities and Exchange Commission, H.R.Doc.No. 95, 88th Cong., 1st Sess. Pt. 2, 550 (1963), described the method by which market makers operate:

> Because there is no central location where the public orders can be collected, matched and executed, the wholesale

3. Section 7323(a)(2) provides:

(a) Any person who:
(2) Offers, sells or purchases a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they are made, not misleading (the buyer or seller not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the

exercise of reasonable care could not have known of the untruth or omission, is liable to the person buying or selling the security from or to him, who may sue either at law or in equity to recover the consideration paid for the security, together with the interest at the legal rate from the date of payment costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security.

dealer is the key firm in the over-the-counter markets. He "makes the market" by advertising his willingness to buy or sell securities for his own account with the expectation of buying at his bid and selling at his offer. There is a wholesale market in a particular security if a broker-dealer stands ready to buy from and sell to other broker-dealers at his quoted prices in amounts at least equivalent to the security's recognized trading unit. Whereas in most exchange stocks only one specialist makes a market, there may be a score of competing wholesale dealers—but there need not be any—bidding for and offering an over-the-counter security.

Because First Jersey acted as a market maker, holding shares of Cavanaugh and ECKO on its account and acting as principal, the Court finds that First Jersey was a seller and that Conley was a buyer of Cavanaugh and ECKO. Conley, therefore, as a buyer, could have maintained an action against First Jersey as a seller of the shares of Cavanaugh and ECKO pursuant to Section 7323 of the Delaware Blue Sky Law in an action to recover the consideration paid for the securities. Thus, the two-year limitation period provided by that Section is applicable in his federal cause of action.

■ Although the Court has determined that Delaware's Blue Sky limitation is applicable to Section 10(b) and Rule 10b–5 actions, this does not end the Court's inquiry on this motion. Acceptance of the two-year term does not mean that the limitation period starts to run from the date of the sale. The accrual of the cause of action and the running of the limitation period is a matter of federal law, even though the limitation period is borrowed from state law. *See Biggans v. Bache Halsey Stuart and Shields, supra,* 638 F.2d at 607 n.3; *Phillips v. Levie,* 593 F.2d 459, 462 (C.A. 2, 1979); *Cook v. Avien, Inc.,* 573 F.2d 685, 694–95 (C.A. 1, 1978); *Hudak v. Economic Research Analysts, Inc.,* 499 F.2d 996, 1000 n.5 (1974), *cert. denied,* 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 821 (1975); *Hill, supra,* 521 F.Supp. at 1387; *Mooney v. Tallant,* 397 F.Supp. 680, 684 (N.D.Ga.1975).

■ Conley argues that his purchase of Cavanaugh and ECKO, which occurred more than two years preceding the filing of his action, was tolled by the federal equitable doctrine of fraudulent concealment. "Under the federal doctrine of fraudulent concealment, the statute of limitations is tolled when the party injured by the fraud 'remains in ignorance of it without any fault or want of diligence on his part.'" *Hill, supra,* 521 F.Supp. at 1387, *quoting Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed.2d 743 (1946). Thus, when the plaintiff discovers or should have discovered the fraud, the statute of limitations begins to run.

First Jersey contends that Conley cannot presently argue that the two-year limitation period was tolled by this federal doctrine because Conley did not plead the doctrine in the complaint. It argues that those actions arising under Section 10(b) and Rule 10b–5 are analogous to actions arising under Section 12(2) of the Securities Act of 1933 which require that the plaintiff plead facts surrounding the discovery of the fraud. Conley, however, asserts that the complaint need not allege that the limitation period was tolled by the defendants' fraudulent concealment before he may effectively use the doctrine, and that those cases arising under Section 10(b) and Rule 10b–5 are distinguishable from those cases which arise under Section 12(2) of the Securities Act.

The statute of limitations of Section 12(2), as provided in Section 13, expressly provides that "no action shall be maintained to enforce any liability created under . . . [section 12(2)] unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." Courts have uniformly held that a Section 13 plaintiff must affirmatively plead sufficient facts in the complaint to demonstrate conformity with Section 13. *See Kroungold v. Triester,* 407 F.Supp. 414, 419 (E.D.Pa.1975); *In re Caesars Palace Securities Litigation,* 360

F.Supp. 366, 377 (S.D.N.Y.1973). As Judge Bechtle stated in *Kroungold*:

A proper complaint should include: 1) allegations as to the time and circumstances of alleged fraud; 2) allegation as to why the alleged fraud was not discovered sooner; and 3) allegations as to what diligence the plaintiff used in making such discovery.

402 F.Supp. at 419.

Conley notes that Section 10(b) and Rule 10b–5 do not expressly toll the limitation period until the aggrieved purchaser or seller has discovered or should have discovered the fraud. Rather, a plaintiff pursuing a Section 10(b) and Rule 10b–5 claim must look to federal common law in order to find the corresponding tolling doctrine. Conley asserts that because the doctrine of fraudulent concealment is a common law right and not a statutory right, there is no requirement that the doctrine be pleaded.

 The Court disagrees with the plaintiff's argument. There is no significant difference, with respect to the pleading requirements, between tolling a limitation period by express statutory provisions and by the equitable doctrine of fraudulent concealment. Both Section 13 and the doctrine of fraudulent concealment similarly affect the applicable statute of limitations; both toll the statute until the aggrieved party has discovered or should have discovered the fraud.[4] Consequently, the Court will follow those courts which require the alleged aggrieved party in a Section 10(b) and Rule 10b–5 action to plead affirmatively the doctrine of fraudulent concealment. *See e.g. Schaefer v. First National Bank*, 509 F.2d 1287, 1297 (C.A.7, 1975), cert. denied, 425 U.S. 943, 96 S.Ct. 1682, 48 L.Ed.2d 186 (1976); *Corson v. First Jersey Securities Inc.*, 537 F.Supp. 1263 at 1268 (D.N.J.1982); *Mooney v. Tallant*, 397 F.Supp. 680, 684 (N.D.Ga.1975); *Klein v. Spear Leeds and Kellogg*, 306 F.Supp. 743, 749 (S.D.N.Y. 1969).

The Court, therefore, will grant defendants' motion for partial summary judgment unless the plaintiff on or before fifteen days from this date serves and files an amended complaint which properly pleads the factual bases for the application of the doctrine of fraudulent concealment. *See e.g. Kroungold v. Triester, supra*, 407 F.Supp. at 419; *Klein v. Spear Leeds and Kellogg, supra*, 307 F.Supp. at 749; *Mooney v. Tallant, supra*, 397 F.Supp. at 684.

An order will be entered in accordance with this Memorandum Opinion.

---

4. Of course, Section 13 has an upper limit— that is, it expressly limits the aggrieved party to a three-year time limitation regardless of knowledge.